**NOT FOR PUBLICATION**                                    **[18, 19]**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

DAVID K. NEWSHAM, an infant           :
by his Guardian Ad Litem              :
KATHLEEN M. NEWSHAM, and              :
KATHLEEN M. NEWSHAM,                  :
individually,                         :
                                      :
      Plaintiffs,                    :
                                      :
v.                                    :          Civil Action No. 08-105 (FLW)
                                      :
TRANSPORTATION SECURITY               :
ADMINISTRATION, THE PORT              :
AUTHORITY OF NEW YORK                 :
AND NEW JERSEY and JOHN               :
DOES 1-10 (representing presently     :
unknown individuals who have          :
owned, harbored, kept, maintained,    :
trained and/or controlled the dog in  :
question),                            :          **OPINION**
                                      :
      Defendants.                    :

---

**WOLFSON, United States District Judge**:

      Defendants Transportation Security Administration ("TSA") and Port Authority of New York and New Jersey ("Port Authority") move separately for summary judgment on all counts of the complaint. Plaintiff David Newsham, an infant by his Guardian Ad Litem Kathleen M. Newsham, and Plaintiff Katheen M. Newsham, individually, (collectively, "Plaintiffs") filed the instant complaint against the Transportation Security Administration ("TSA"), and the Port Authority of New York and New Jersey ("Port Authority"). The complaint asserts causes of action on tort theories of negligence and

1

strict liability arising out of a dog bite sustained by the infant Plaintiff, at his home, from a canine that was under the care of the infant's father, a Port Authority Police Officer. Plaintiffs assert that this Court has jurisdiction over claims against TSA under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) ("FTCA" or the "Act"), and supplemental jurisdiction over claims against Port Authority under 28 U.S.C. § 1367(a). Defendant TSA moves for summary judgment on multiple grounds, including that this Court lacks subject-matter jurisdiction because 28 U.S.C. § 2680(a), the "discretionary function" exception to § 1346(b), applies to Plaintiffs' claims, and TSA retains sovereign immunity. After reviewing the supporting and opposing briefs, this Court finds that because the "discretionary function" exception applies to Plaintiffs' claims, the Court lacks subject matter jurisdiction over Defendant TSA, and accordingly GRANTS TSA's motion and dismisses TSA from the suit. This Court declines to exercise supplemental jurisdiction over the state law claims asserted against Defendant Port Authority. The Court, having determined not to exercise supplemental jurisdiction over the claims against the Port Authority, makes no ruling as to the merits of Port Authority's motion, which may be raised in state court.

## I.     Background

Plaintiff David K. Newsham is an infant child under the care and custody of his mother, Plaintiff Kathleen M. Newsham, and his father, Port Authority Police Officer David H. Newsham ("Officer Newsham") at the time of the incident in this complaint. Newsham Depo.[1] at T10:18 – 11:12. Port Authority, through its Police K-9 unit, participates in TSA's National Explosives Detection Canine Team Program ("NEDCTP"

---

[1] "Newsham Depo." refers to the Deposition of David H. Newsham, dated July 6, 2009, attached as Exhibit 3 to the Declaration of Mark C. Orlowski.

or "Program").[2]  Viator Decl.[3] at ¶ 8; Ex. 1.  The NEDCTP is a program that trains TSA owned bomb-search canines.  Viator Decl. at ¶¶ 3, 7, 8.  The Program operates in cooperation with state and local law enforcement agencies, including the Port Authority Police.  Id.  Although TSA maintains ownership over the canines in the Program, the local law enforcement agency supplies the police officer canine handler.  Id. at ¶¶ 8, 11; Ex. 1.

To become part of the NEDCTP, Port Authority entered into the "Cooperative Agreement"[4] and "Statement of Joint Objectives"[5] with TSA.  These two documents delineate the responsibilities of each party under the Program.  Specifically, TSA is responsible for training the canines and their handlers, as well as for establishing the search protocols used by Port Authority.  Lawson Depo.[6] at T13:20 - 15:17; Cooperative Agreement.  Port Authority is responsible for providing handlers, daily care and kenneling of the canines—although TSA reimburses these costs.  Hering Depo.[7] at T85:1-24; Lawson Depo. at T74:18 – 76:16; Cooperative Agreement.  Additionally, Port Authority directs the daily operations and search routines of the canines and their handlers.  Lawson Depo. at T74:18 – 76:16; Cooperative Agreement.  Specifically, Port Authority has its own "Local Canine Training Manual" that applies to all Port Authority dog handlers.  Hering Depo. at T37:13 – 38:25.  Included within the Manual is the

---

[2] Because the NEDCTP is a program of the TSA, references to NEDCTP in this opinion are equivalent to references to Defendant TSA.

[3] "Viator Decl." refers to Declaration of Kevin Viator, Chief of the Canine Training and Evaluation Branch for the NEDCTP.

[4] Dated December 26, 2001, attached as Exhibit 1 to Declaration of Kevin Viator.

[5] Dated April 24, 2006, attached as Exhibit 2 to Declaration of Kevin Viator.

[6] "Lawson Depo." refers to Deposition of Steven Lawson, dated July 6, 2009, attached as Exhibit 2 to Declaration of Mark C. Orlowski.

[7] "Hering Depo." refers to Deposition of Sergeant Thomas Hering, dated July 7, 2009, Port Authority Supervisor of Officer Newsham.

instruction that "The primary responsibility for the safe handling and control of the police canine rests on the individual handler." Id. Thus, both TSA and Port Authority policy dictates that handlers are ultimately responsible for the day to day supervision, control, and disciplining of their dogs. Id.; Lawson Depo. at T76:14 – 77:23; Cooperative Agreement.

When a training or aggression issue with a canine arises, Port Authority protocol requires a handler to report any issues with his or her canine first to a Port Authority supervisor. Hering Depo. at T66:4 – 73:4. There is no separate policy for NEDCTP canines as opposed to Port Authority canines. Id. at T66:4 – 67:2. For all reported dog problems, the Port Authority supervisor first determines the appropriate course of action, generally attempting to resolve the problem himself. Id. at T67:3 – 68:12; T70:6-13 ("I don't just call up Steve Lawson if the dog . . . growled at [the handler]"). With NEDCTP canines, the Port Authority supervisor may also decide to seek additional guidance from the TSA side of the NEDCTP. Id. at T70:6-13. Alternatively, the handler can contact a TSA trainer office directly for help with the canine for minor behavioral and acclimation problems. Viator Decl. at Ex. 3 ("Acclimation Letter"). However, TSA does not have a specific protocol in place for NEDCTP dog bite incidents, because a handler must follow Port Authority's own guidelines. Lawson Depo. at T59:19-25. For this reason, once a handler has reported an aggression issue to the Port Authority supervisor, it is that supervisor's—and not TSA's—responsibility to resolve the issue. Lawson Depo. at T29:10-23; T49:6-23; T79:9-22.

As part of the Program, Officer Newsham was assigned to bomb detection dog Dini at the training facility on Lackland Air Force Base in San Antonio, Texas.

4

Newsham Depo. at T5:21-25, T29:3-7.  Throughout the training program, and again at its conclusion, Officer Newsham was provided with instructions on proper handling of Dini, including warnings of the possibility of dog bites and how to avoid them.[8]  Newsham Depo. at T36:10 – 37:25, T38:1-10, T45:1-13.  These instructions are part of a training and handling policy developed by the NEDCTP.  Viator Decl. at ¶¶ 13-15.  There is no statute or other rule or regulation that mandates the NEDCTP's policy with regard to canine training and handling.  Id. at ¶¶ 13-14.  Instead, the Chief of the Canine Training and Evaluation Branch for the NEDCTP establishes the policy and regulations relating to canines, including training, handling, and removal of canines from the NEDCTP.  Id. at ¶¶ 13-14, 19.  At all times relevant to this complaint, Kevin Viator was the Chief of the Canine Training and Evaluation Branch ("Chief Viator").  Viator Depo.[9] at T21:11-16.  Chief Viator retained the ultimate discretion over whether to certify a canine for the Program, and whether to remove a canine from its handler.  Viator Decl. at ¶ 7; Viator Depo. at T132:12-21.

Upon the conclusion of training in November, 2006, Officer Newsham returned to his police work at Port Authority with Dini.  Newsham Depo. at T47:15 – 49:10, T59:7-16.  From this point on, Officer Newsham maintained complete custody, control, and care over Dini, both during and after working hours.  Id.  In accordance with NECDTP and Port Authority policy, Dini spent his nonworking hours at Officer

---

[8] Specifically, Officer Newsham received an "acclimation packet" and an "ouch letter." (Attached as Exhibits 3 and 4, respectively, to Declaration of Kevin Viator). These two documents provide information on how to help a dog adjust to a new environment in the handler's home.  The letter also describes the concern of dog bites and how best to avoid them.  Viator Decl. at ¶ 16.

[9] "Viator Depo." refers to Deposition of Kevin Viator, dated July 7, 2009, attached as Exhibit 1 to Declaration of Mark C. Orlowski.

Newsham's residence.  Id.  Port Authority provides no separate kenneling service for canines.  Hering Depo at T85:1-24; Lawson Depo. at T74:18 – 76:16; Statement of Joint Objectives.  At the Newsham residence, Dini was sometimes allowed to move freely around the house.  Kathleen Newsham Depo.[11] at T24:23 – 25:20.  Plaintiff Kathleen Newsham, however, requested that Officer Newsham not allow Dini in the house when their son, Plaintiff David Newsham, was present.  Id. at 126.

Officer Newsham and Dini initially worked together without Dini exhibiting aggressive behavior.  Newsham Depo. at T50:10-13.  However, Officer Newsham later noticed Dini jumping on bags during searches.  Id. at T55:17-22.  This type of behavior is considered inappropriate and aggressive.  Viator Depo. at T113:5 – 114:18.  Officer Newsham relayed this behavior to an NEDCTP training officer, who provided Officer Newsham with information on how to correct Dini's behavior.  Newsham Depo. at T55:17 – 58:3.

At home, Dini did not interact well with the Newshams' other pet dogs.  Id. at T56:12 – 58:12.  Additionally, in December, 2006, Dini displayed aggressive behavior toward Officer Newsham on two occasions.  Newsham Depo. at T63:6-16.  Specifically, Dini once bit Officer Newsham upon being woken up one night, and later Dini growled at Officer Newsham.  Id. at T61:17 – 64:3.  Despite this, neither Officer Newsham nor Plaintiff Kathleen Newsham recall Dini showing aggression toward the Plaintiffs prior to the January 7, 2007 dog bite that is the subject of this litigation.  Id. at T60:24 – 61:1, T61:13-16, T81:11-13; Kathleen Newsham Depo. at T22:13-22.

---

[11] "Kathleen Newsham Depo." refers to Deposition of Kathleen Newsham, dated January 20, 2009, attached as Exhibit 4 to Declaration of Mark. C. Orlowski.

Around this same time in December, 2006, Officer Newsham took Dini to Captain Maria Pfannenstiel as part of a semi-annual exam. Pfannenstiel Depo.[12] at T13:9-20; Newsham Depo. at 66. Captain Pfannenstiel is a military veterinarian who had an agreement with TSA and Port Authority to occasionally examine NEDCTP dogs. Pfannenstiel Depo. at T7:13-20, T11:9-24. There is no NEDCTP protocol for Captain Pfannenstiel to remove a canine from a handler, even for reasons of aggression. Viator Depo. at T174:3-25; Pfannenstiel Depo. at T41:4-11. Officer Newsham described Dini's behavior to Captain Pfannenstiel. Id. at 14. Although Captain Pfannenstiel and Officer Newsham disagree over what her advice was on how to correct Dini's behavior, neither took additional action at this time. Id. at T19:12-17; Newsham Depo. at T69:9-14.

Thereafter, on January 3, 2007, Officer Newsham mentioned Dini's behavior to Field Canine Coordinator ("FCC") Steve Lawson. Newsham Depo. at T71:5-8, T73:8-19. As FCC, Lawson is a TSA employee, and the liaison in the NEDCTP between the TSA and the local law enforcement agency, Port Authority. Viator Depo. at T22:6 – 23:13. Lawson's responsibilities primarily include overseeing the operating procedures of Port Authority and ensuring its compliance with the Cooperative Agreement of the NEDCTP. Lawson Depo. at T6:23 – 7:21, T13:7 – 15:17. Similar to Captain Pfannenstiel, there is no protocol for FCC Lawson to remove Dini from Officer Newsham. Id. at T29:10 – 30:12, T49:12 – 50:20. Rather, TSA and Port Authority policy dictates that handlers with canine issues report them directly to a Port Authority supervisor. Lawson Depo. at T29:10 – 30:12; Hering Depo. at T66:10 – 68:12. At the time, Officer Newsham's supervisor was Sergeant Thomas Hering. Hering Depo. at

---

[12] "Pfannenstiel Depo." refers to Deposition of Captain Maria Pfannenstiel, dated July 6, 2009, attached as Exhibit 5 to Declaration of Mark C. Orlowski.

T73:5-21.  Although Sergeant Hering was informally aware that Officer Newsham was having problems with Dini, Officer Newsham never made an official report, complaint, or request to Sergeant Hering.  Id. at T76:12 – 77:3.

After the discussion with Officer Newsham, FCC Lawson did not immediately relay Dini's reported behavior to anyone, but did include it in his weekly report.  Lawson Depo. at T31:2-25, 36:4-15.  The information in this weekly report was available to his supervisors the same day it was entered.  Id. at T104:9-16.  Although Officer Newsham talked to Captain Pfannenstiel and FCC Lawson, he never contacted Chief Viator or other TSA trainers directly, and he made no subsequent reports to TSA or Port Authority regarding these incidents.  Newsham Depo. at T128:17 – 129:4.

On the evening of January, 7, 2007, the date of the incident that is the subject of Plaintiffs' complaint, Officer Newsham was at home watching TV.  Id. at T78:2-9.  In the same room were Plaintiff David Newsham, playing freely, and the canine Dini, unrestrained and outside of the immediate control of Officer Newsham.  Id. at T78:13-20, T84:18 – 85:7.  According to Officer Newsham, David was playing with a puzzle and dropped a piece to the floor.  Id. at 83:4-13.  When both David and Dini simultaneously moved toward it, Dini bit David and caused him to sustain injuries.  Id.

Plaintiffs filed the instant complaint against Defendant TSA as the owner of the canine Dini, and against Defendant Port Authority as the employer of Officer Newsham. The complaint lists five Counts, as follows: (I) Defendants are liable under New Jersey common law negligence; (II) Defendants are strictly liable under the New Jersey "Dog Bite" statute; (III) Defendants are strictly liable under the common law for dog bite

injuries; (IV) Defendants are liable for Plaintiffs' medical expenses; (V) Other not yet named defendants may be liable, and Plaintiffs will amend their complaint if necessary.

## II.        Standard of Review

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986). A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  To show that a genuine issue of material fact exists, the nonmoving party may not rest upon mere allegations, but must present actual evidence in support thereof.  Id. at 249 (citing First Nat'l Bank of Arizona v. Cities Svc. Co., 391 U.S. 253, 290, 88 S. Ct. 1575, 1593 (1968)).  In evaluating the evidence, the Court must view evidence and draw inferences "in the light most favorable to the party opposing the motion."  Waldorf v. Shuta, 896 F.2d 723, 728 (3d Cir. 1990) (quoting Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).

## III.       Discussion

### A. Defendant TSA's Motion for Summary Judgment

As a preliminary matter, TSA points out, correctly, that Plaintiffs have not named the proper defendant in their complaint.  Pursuant to 28 U.S.C. § 2769, when an action is brought against the United States under the provisions of 28 U.S.C. § 1346(b), a federal agency may not be sued in its own name.  See Nazaro v. U.S., 304 F.Supp.2d 605, 616

(D.N.J.) ("Claims brought under the FTCA, however, may only be brought against the United States; federal agencies are never appropriate defendants."). The sole proper defendant in this case is the "United States" and not the TSA. Accordingly, the Court finds *sua sponte* substitution of the United States in place of TSA a necessary prerequisite to the Court's consideration of the instant motion. TSA is hereby dismissed from this action and the United States substituted in its place as Defendant. As the parties have throughout their briefing in this motion referred to defendant solely as TSA, for ease of understanding, the Court too shall refer to defendant as TSA, however, such references shall be construed to refer to the United States as the proper defendant.

In its motion, TSA argues that Plaintiffs have failed to prove all elements of negligence, specifically the duty of care and proximate causation elements. TSA further argues that even if Plaintiffs could prove negligence, the "discretionary function" exception to the Act applies to TSA's actions, thereby preserving TSA's sovereign immunity from suit. Similarly, TSA argues that it retains sovereign immunity from Plaintiffs' strict liability claims, as those arise outside of the FTCA's waiver of immunity. Lastly, TSA states that Count IV of Plaintiffs' complaint is not a cause of action but a request for damages. The Court will address these issues in turn.

Defendant TSA denies it owed any duty to Plaintiffs, or that it breached any duty. Defendant further argues Officer Newsham's independent acts sever whatever proximate cause may exist between TSA's acts and the damage resulting from the dog bite. Most significantly, Defendant TSA argues that because the acts in question fall under the "discretionary function" exception to the government's liability under the Act, TSA retains its sovereign immunity from this suit. As sovereign immunity would prevent this

10

Court from exercising jurisdiction over any of Plaintiffs' claims, the Court addresses this issue first.

"Absent a waiver, sovereign immunity shields the Federal Government . . . from suit." FDIC v. Meyer, 510 U.S. 471, 475, 114 S. Ct. 996, 1000 (1994). The FTCA, however, "was designed primarily to remove the sovereign immunity of the United States from suits in tort and . . . to render the Government liable in tort as a private individual would be under like circumstances." Richards v. United States, 369 U.S. 1, 6, 82 S. Ct. 585, 589 (1962). In short, the FTCA waives the United States' sovereign immunity from suit for tort claims. Specifically, subsection (b) (1) of the Act establishes jurisdiction in federal district courts for the negligence of any government employee if there is a state law cause of action. 28 U.S.C. § 1346(b); Fisher Bros. Sales, Inc. v. United States, 46 F.3d 279, 281 (3d Cir. 1995). Moreover, "[b]ecause the Federal Tort Claims Act constitutes a waiver of sovereign immunity, the Act's established procedures have been strictly construed." Livera v. First Nat'l State Bank of New Jersey, 879 F.2d 1186, 1194 (3d Cir. 1989).

An exception to the government's liability under the FTCA is found in 28 U.S.C. § 2680(a), which states that the Act does not apply to:

> Any claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

The purpose of this exception—termed the "discretionary function" exception—is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Berkovitz by Berkovitz v. United States, 486 U.S. 531, 536-537, 108 S. Ct. 1954, 1959

11

(1988) (quoting United States v. Varig Airlines, 467 U.S. 797, 814, 104 S. Ct. 2755, 2764-65 (1984)).  For the exception to apply, a court must determine both: (1) whether the federal agency or employee's action was a matter of choice; and (2) whether the judgment involved in the choice was the type the exception was designed to shield. Mitchell v. United States, 225 F.3d 361, 363-64 (3d Cir. 2000) (quoting United States v. Gaubert, 499 U.S. 315, 322-23, 111 S. Ct. 1267, 1274 (1991)).

Moreover, when a government employee is allowed to exercise discretion within an established policy, and when the alleged negligence is based on that employee's act, there is a presumption that the act is grounded in that policy.  See Gaubert, 499 U.S. at 324.  The Third Circuit has held that once the Plaintiff has demonstrated that a claim falls within the scope of the FCTA, "the United States has the burden of proving the applicability of the discretionary function exception."  Merando v. United States, 517 F.3d 160, 164 (3d Cir. 2008) (citations omitted).  Lastly, because the purpose of the exception is to shield discretionary policy decisions from liability, the exception applies even when an employee's alleged acts are negligent.  Gaubert, 499 U.S. at 323 (citing Varig Airlines,  467 U.S. at 830).  The Gaubert test thus focuses on the nature of a government agency's or employee's conduct, not on whether the conduct was negligent. Id.

The first prong of the Gaubert test is straight-forward.  The employee's action must not be prescribed or proscribed by any statute, regulation or established policy.  Id.. at 322. Otherwise, the action could not be considered a product of choice, and therefore not discretionary, as "the employee ha[d] no rightful option but to adhere to the

directive."   Berkovitz, 486 U.S. at 536.   As was explained by the Supreme Court in

Gaubert,

> [I]f a regulation mandates particular conduct, and the employee obeys the
> direction, the Government will be protected because the action will be
> deemed in furtherance of the policies which led to the promulgation of the
> regulation.  If the employee violates the mandatory regulation, there will
> be no shelter from liability because there is no room for choice and the
> action will be contrary to policy.  On the other hand, if a regulation allows
> the employee discretion, the very existence of the regulation creates a
> strong presumption that a discretionary act authorized by the regulation
> involves consideration of the same policies which led to the promulgation
> of the regulations.

Gaubert, 499 U.S. at 324, 111 S. Ct. at 1274.  Simply put, the employee must be allowed

by statute, regulation, or policy, to have the discretion to engage in the act in question.

See Mitchell, 225 F.3d at 363 (citing Gaubert, 499 U.S. at 322).

        The second prong of the test requires a determination of whether the agency's or

employee's action was the type the exception was designed to shield.   Id. This

determination, however, is not a subjective determination of whether the employee

actually made the decision for policy reasons.  Instead, all that is required is that the

action taken is "susceptible to policy analysis."   Gaubert, 499 U.S. at 325.  The Third

Circuit has stated that this inquiry is fact-specific, Mitchell, 225 F.3d at 365, and that the

exception only extends to protect acts that are related to the specific policy concerns of a

federal agency, and not to "a mundane, administrative, garden-variety, housekeeping

problem."  Gotha v. United States, 115 F.3d 176, 181 (3d Cir. 1997).  Put differently,

there are "discretionary acts performed by a Government agent that are within the scope

of his employment but not within the discretionary function exception because these acts

cannot be said to be based on the purposes that the regulatory regime seeks to

accomplish."  Gaubert, 499 U.S. at 325 n.7.  Thus, when the two prongs are taken

13

together, the discretionary function exception can only apply to a "permissible exercise of policy judgment" by a United States government agency or its employee.  Id.  at 326.

As noted by the Third Circuit, before engaging in the two-part inquiry "to determine whether the discretionary function exception immunizes the Government from a suit based on its conduct, [a court] must identify the conduct at issue.'"  Merando, 517 F.3d at 165.  Accordingly, the Court turns to the conduct at issue here.  Plaintiffs initially claim that Defendant TSA is negligent "in the manner in which [it] owned, trained supervised, harbored, kept, controlled, or otherwise maintained" Dini.   Plaintiffs' complaint at ¶ 10.  Based on the foregoing allegation, Defendant TSA cites the following two bases upon which Plaintiffs' negligence claim against it may be grounded: (1) that TSA was negligent when it created a policy that did not prohibit NEDCTP canines from being kenneled in the handlers' homes, around children; and (2) that TSA was negligent when it did not remove Dini from Officer Newsham's custody, after Officer Newsham reported Dini's aggressive behavior to military veterinarian Captain Pfannenstiel and TSA employee FCC Lawson.  Defendant TSA's Motion for Summary Judgment at 22-28.  The Court will analyze each of the foregoing grounds for negligence in turn under the Gaubert test.

With regard to TSA's kenneling policy, this Court finds that it easily satisfies the first prong of the Gaubert test.  Indeed, the NEDCTP's policy and procedures are left to the discretion of the Chief of the Canine Training and Evaluation Branch, Chief Viator. There is no law, regulation, or policy that dictates TSA's actions with respect to the kenneling of canines in the NEDCTP.  Chief Viator provided uncontradicted deposition testimony that he and his staff establish and enforce their own policy for the training,

14

handling, care, and removal of NEDCTP canines.  Viator Depo. at T132:12-21.  Chief

Viator exercised this discretion when he established a policy that permitted canine

handlers to kennel the NEDCTP dogs in their homes, and to introduce the dogs to the

handlers' families.  However, Chief Viator further provided that the NEDCTP has a "no-

pet" policy with regards to the handler's family.  Viator Depo. at T85:2-7.  That is, "no

one should be petting the dog except the handler."  Id.  Chief Viator exercised similar

discretion by allowing the local law enforcement agencies that participate in the

NEDCTP to establish their own policy on where to board the canines—whether at a

private boarding facility or at the handler's home.   In fact, the Statement of Joint

Objectives, which defines the responsibilities and conditions that the Port Authority

agrees to in connection with its participation in the NEDCTP, expressly provides that

Port Authority "will provide safe and sanitary kennel facilities for Program canines.  This

applies to kenneling canines at the mass transit system/handlers' residence or commercial

boarding facility."  Viator Decl. at Exhibit 2.

The NEDCTP kenneling policy also satisfies the second prong of the Gaubert test

because it is susceptible to a policy analysis.  Chief Viator's decision to allow the local

law enforcement agencies to develop their own kenneling policy accords with a policy

decision on how to allocate the NEDCTP's limited resources.   By delegating the

kenneling policy to the Port Authority, Chief Viator and his staff were able to use their

time to focus on other aspects of the Program.  See Viator Depo. at T204:5 – 205:18.

Potential contact between the canine and members of the handler's family necessarily

flows from the decision to allow home kenneling.   In sum, this Court finds the

NEDCTP's kenneling policy decision is based on considerations of economic and

operational policy, and falls within the "discretionary function" exception to tort liability under the FTCA.[13]

A more nuanced analysis is required with regard to TSA's liability for failing to remove Dini from Officer Newsham after he reported Dini's aggressive behavior.  Again, the first prong of <u>Gaubert</u> is easily satisfied.  No law, regulation, or policy directs that Chief Viator establish a policy requiring immediate removal of a canine from its handler when the canine exhibits aggressive or otherwise inappropriate behavior.  Rather, Chief Viator exercised discretion in choosing not to establish any policy or procedure regarding when to remove canines from the handlers, instead making this decision on a case by case basis.   Viator Depo. at T132:12-21; Viator Decl. at ¶19 ("I maintain exclusive discretion to determine when a dog must be removed from a handler's immediate custody . . . on a case by case basis . . . .").  Thus, when FCC Lawson was informed by Officer Newsham of Dini's aggressive behavior, Lawson violated no policy or procedure by not taking immediate action regarding Dini, other than including it in his weekly report.[14]

Significantly, Plaintiffs appear to concede that if Chief Viator himself chose not to remove Dini from Officer Newsham, this choice would fall within the "discretionary function" exception.  Plaintiffs' Opp. Br. To TSA Motion at 16.  Instead, Plaintiffs focus on FCC Lawson's conduct.  Plaintiffs argue that FCC Lawson's failure to directly inform his supervisor of Dini's aggressive behavior cannot be covered by the "discretionary

---

[13] Significantly, in opposition to the instant motion, Plaintiffs do not appear to contest the fact that the kenneling policies fall within the discretionary exception.  Instead, Plaintiffs focus their opposition on the conduct of FCC Lawson.  <u>See</u> Brief Submitted on Behalf of the Plaintiff [*sic*] in Opposition to Defendant Transportation Security Administration's Motion for Summary Judgment ("Plaintiffs' Opp. Br. To TSA Motion") at 15-17.
[14] Indeed, Officer Newsham was required under the Cooperative Agreement between TSA and Port Authority, as well as Port Authority policy, to inform his Port Authority superior of Dini's problems before proceeding to the NEDCTP.  <u>See</u> Lawson Depo. at T29:10 – 30:12; Cooperative Agreement.

function" exception because this conduct was not the result of any choice based in policy considerations, but rather was mere negligence.[15]  Essentially, Plaintiffs' argument that TSA is liable for FCC Lawson's inactions is two-fold: (1) Lawson made no policy considerations when he chose not to take any action regarding Dini; and (2) only the actions of an agency or head of an agency fall within the scope of the exception, not the actions of an individual within the agency who does not have any policy-making power. For the reasons that follow, neither of Plaintiffs' arguments are supported by case law.

First, the test to determine whether a government employee's actions satisfy the second prong of the "discretionary function" exception is not, as plaintiffs argue, whether the employee actually debated policy considerations before choosing to act or not act. Gaubert, 499 U.S. at 325.  Rather, the test focuses "on the nature of the actions taken and on whether they are susceptible to policy analysis."  Id.  In addition, the Third Circuit has reasoned that, "'[t]he test is not whether the government [employee] actually considered each possible alternative in the universe of options, but whether the conduct was of the type associated with the exercise of official discretion.'"  U.S. Fidelity & Guarantee Co. v. United States, 837 F.2d 116, 120 (3d Cir. 1988) (quoting Smith v. Johns-Manville Corp., 795 F.2d 301, 308-09 (3d Cir. 1986)).

Here, Lawson acted within both NEDCTP policy and his role as FCC.  Neither required that he initiate procedures to remove Dini from Officer Newsham, or that he contact Chief Viator to immediately report Dini's behavior.   Because Lawson's

---

[15] The Court notes that Plaintiffs have undermined their arguments against FCC Lawson and TSA in their opposition brief to Port Authority's Motion for Summary Judgment. Specifically, Plaintiffs state that FCC Lawson told Officer Newsham to "keep the dog away from his child until they could determine exactly why the dog was being aggressive."  Plaintiffs' Response to Port Authority's Motion for Summary Judgment at 23.  Plaintiffs further assert that "Port Authority and its employee [Officer Newsham] ignored these instructions.  They also ignored the training provided by the TSA . . . ."  Id.

"[a]ctions [were] taken in furtherance of the program [they are] likewise protected" from tort liability. Gaubert, 499 U.S. at 323 (citing Varig Airlines, 467 U.S. at 820). More importantly, this protection exists even if Lawson acted negligently. Id.; Sea-Land Service, Inc. v. United States, 919 F.2d 888, 892 (3d Cir. 1990) ("the government may be negligent but nevertheless immune from tort liability").

Plaintiff's second argument fails for similar reasons. The discretionary function exception is not limited to those agencies and heads of agencies who make choices based in policy concerns. The exception also extends to shield the actions of employees who act within the scope of that policy. Gaubert, 499 U.S. at 324. Thus, in instances where an agency's policy or regulation "mandates particular conduct, and the employee obeys the direction . . . the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." Id. Additionally, in instances where an agency's policy or regulation allows an employee discretion to exercise his duties under the policy or regulation, then "the very existence of the regulation creates a strong presumption that [the employee's] discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." Id. Similarly, the Supreme Court has rejected the principle that "operational" conduct or "day-to-day management" falls outside of the "discretionary function" exception because there is no policymaking involved. Id. at 325 ("Discretionary conduct is not confined to the policy or planning level."). Operational conduct still contains inherent discretionary decisions. Id. Again, it bears repeating that a court does not inquire into the employee's subjective intent, but only determines if the employee's actions are susceptible to a policy analysis. Id.

Here, there was a regulation or policy that established the FCC as a liaison in the NEDCTP between Port Authority and TSA.  If this policy directed FCC Lawson to take no action beyond entering Dini's behavior into his weekly report, then this inaction is in furtherance of a discretionary function, and within the scope of the exception.  If the policy merely granted FCC Lawson the discretion not to take further action, then his inaction is presumed to follow from policy considerations.   This presumption is strengthened by the fact that FCC Lawson's job description did not entail training or correcting behavioral issues of canines, nor did he have the authority to remove Dini from Officer Newsham's custody.  As established earlier, Newsham was required to report to Sergeant Hering, not FCC Lawson, when Dini began exhibiting behavioral issues.  Lawson Depo. at T29:10 – 30:12; Hering Depo. at T66:10 – 68:12.  Sergeant Hering testified that it would not be proper for a Port Authority handler to directly advise TSA of an aggression issue without first advising his or her in-line supervisor.  Hering Depo. at T66:10 – 68:12.  Indeed, FCC Lawson testified that because of the nature of the relationship between TSA and Port Authority, once a handler reports an aggression issue to a Port Authority supervisor, it the supervisor's responsibility to address the behavioral problem.  Lawson Depo. at T29:10-23, T49:6-23; T79:9-22.  Significantly, Lawson stated that the reason TSA has no protocol for dog bite incidents in the NEDCTP is precisely because the handler is an employee of Port Authority, which has its own protocol.  Id. at T59:19-25.

This Court finds FCC Lawson's decision to take no action was in furtherance of an NEDCTP policy that itself was based on policy considerations that satisfy the second-prong of the Gaubert test.  These policy considerations include, but are not limited to,

19

Chief Viator's decision to allocate resources for day-to-day canine handling to the cooperating local law enforcement agencies in the NEDCTP.   Moreover, these considerations and FCC Lawson's actions are not the product of "a mundane, administrative, garden-variety, housekeeping problem."  Gotha, 115 F.3d at 181.  Rather, the decision on whether the FCC or a Port Authority supervisor is responsible for canine handling relates directly to the mission and purpose of the NEDCTP—to provide trained search canines to local law enforcement agencies in an efficient manner.   Accordingly, Lawson's acts follow from TSA's discretionary policy and are within the "discretionary function" exception to tort liability under the FTCA.  See Gaubert, 499 U.S. at 325 (citing Varig Airlines,  467 U.S. at 820 ("not only was this [agency's] act discretionary but so too were the acts of agency employees in executing the program")).[16]  Accordingly, TSA retains immunity, and Plaintiffs' negligence claim in Count I of their complaint is dismissed.

Plaintiffs additionally alleged in Counts II and III of their complaint that TSA is strictly liable for dog bite damages, both under New Jersey common law, and under New Jersey Statute, N.J.S.A. 4:19-16.   TSA moves to dismiss both Counts because these claims do not arise under the FTCA, and TSA has not waived its sovereign immunity for

---

[16] The Court additionally notes that a Texas district court has reached the same result under similar facts stemming from a dog bite incident.  See Phillips v. United States, 500 F. Supp. 2d 668, 672 (W.D. Tex. 2006) ("Because the Post Commander at Fort Bliss had the authority to exercise personal choice and judgment in the creation and implementation of pet regulations at that military installation, the Court concludes that the adoption and implementation of [the Post Commander's regulations] were discretionary actions as contemplated by the DFE ["discretionary function" exception].").  But see Bridges v. United States, No. 07-2987, 2008 WL 4449962, at *2 n.2 (E.D. La. Sept. 29, 2008) (stating summarily in dicta that "[a]dequate supervision and responsible use of a security canine is not a 'judgment or choice' protected by the exception.").

strict liability claims.  Plaintiffs do not oppose TSA's motion in this regard.  Accordingly Counts II and III are dismissed.

Additionally, the Court finds that Count IV of Plaintiffs' complaint is not a cause of action, but a request for damages, based on TSA's liability under Counts I, II, and III. Because these three counts have been dismissed as to Defendant TSA, Count IV's request for medical expenses is moot.

## B. Supplemental Subject-Matter Jurisdiction Over Plaintiffs' Claims Against Defendant Port Authority

Like TSA, Port Authority similarly moves to dismiss all of Plaintiffs' counts in the complaint.  Before proceeding to the merits of Port Authority's motion, the Court must consider whether it has subject-matter jurisdiction over Plaintiffs' claims against Port Authority.

Plaintiffs assert that this Court has supplemental jurisdiction over these state law claims against Port Authority under 28 U.S.C. § 1367(a), which states that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."  However, when a court has dismissed all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over the remaining claims.  28 U.S.C. § 1367(c)(3).  Indeed, unless circumstances dictate otherwise, district courts generally should decline to exercise supplemental jurisdiction. See Burnsworth v. PC Laboratory, No. 08-4248, 2010 WL 318300 (3d Cir. Jan. 28, 2010) ("where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide pendant state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an

affirmative justification for doing so.") (quoting <u>Hedges v. Musco</u>, 204 F.3d 109, 123 (3d Cir. 2000)) (emphasis in original); <u>see also</u> <u>Elkadrawy v. Vanguard Group, Inc.</u>, 584 F.3d 169, 174 (3d Cir. 2009); <u>Oras v. City of Jersey City</u>, 328 Fed. Appx. 772, 775 (3d Cir. 2009).   The Court recognizes that neither party has argued the merits of this issue. Nonetheless, there are no apparent considerations of judicial economy, convenience, or fairness that justify this Court's exercise of supplemental jurisdiction over Port Authority once TSA has been dismissed from the case.

Plaintiffs have not asserted any basis for jurisdiction other than supplemental jurisdiction based on Plaintiffs' claims against TSA.   Although Port Authority argues that it should share TSA's immunity from suit because it is involved in a federal government contract, the mere fact that Port Authority raises this as a defense does not appear to give this Court subject-matter jurisdiction over Plaintiffs' state law claims.[17] Neither Plaintiffs nor Port Authority have provided the Court with any law to the contrary.   Port Authority cites to <u>Boyle v. United Technologies Corp.</u>, 487 U.S. 500, 108 S. Ct. 2510 (1988), in support of extending the government's immunity to itself.   The <u>Boyle</u> Court held that a private military equipment supplier to the United States government could share in the government's immunity from FTCA product-liability claims.   <u>Id.</u>   The Court reasoned that "uniquely federal interests" in military procurement contracts requires a government contractor be shielded from liability if the federal government would itself be shielded under the "discretionary function" exception.   <u>Id.</u> at 505-06.   However, <u>Boyle</u> Court did not address whether simply raising this "government contractor defense" confers jurisdiction in the federal courts because the issue was not before the Court.   Similarly,

---

[17] For this reason, the Court makes no judgment as to the merits of Port Authority's "government contractor defense."

subsequent courts that apply the defense do not discuss whether the defense is jurisdictional in nature.  See, e.g., Woodward Governor Co. v. Curtiss Wright Flight Systems, Inc., 164 F.3d 123, 127 (2d Cir. 1999) (acknowledging the existence of a government contractor defense in limited circumstances, but holding the defense inapplicable in the instant case because the contract at issue was "too far removed from issues of uniquely federal concern"); see also Board of Educ. of City of Clifton v. W.R. Grace Corp., 258 N.J. Super. 94, 112, 609 A.2d 92, 102 (N.J. Super. Ct. 1992) (adopting the Boyle analysis as to the applicability of a government contractor defense).

Moreover, the "government contractor defense" has been raised in New Jersey state courts.  See Anzalone v. Westech Gear Corp., 661 A.2d 796, 798, 141 N.J. 256, 259 (N.J. 1995); Siverstein v. Northrop Grumman Corp., 842 A.2d 881, 886 (N.J. App. Div. 2004).  Thus, the Court remains unconvinced that it should exercise subject matter jurisdiction over Plaintiffs' state law claims against Port Authority solely on the grounds of Port Authority's "government contractor defense."

The Court has dismissed all claims against Defendant TSA.  There are no additional federal or other claims in this case over which the Court has original jurisdiction.  Plaintiffs have not provided any other justification for the Court's exercise of jurisdiction over claims against Port Authority.  Moreover, Plaintiffs have not asserted any basis for the exercise of diversity jurisdiction.[18]  Accordingly, the Court dismisses all of Plaintiffs' remaining claims against Port Authority.  The statute of limitations is tolled

---

[18] Plaintiffs would be unlikely to succeed in claiming diversity jurisdiction, as it appears both Plaintiffs are residents of the state of New Jersey, and Port Authority is considered a citizen of both New York and New Jersey for purposes of establishing diversity jurisdiction.  See, e.g., Da Cruz v. Towmasters of New Jersey, Inc., 217 F.R.D. 126, 133 (E.D.N.Y. 2003); see also Yancoskie v. Delaware River Port Authority, 528 F.2d 722, 727 (3d Cir. 1975) (holding that bistate agency created by Pennsylvania and New Jersey are citizens of both states for diversity jurisdiction purposes).

for thirty days after dismissal to allow Plaintiffs to file their claims against Port Authority in state court pursuant to 28 U.S.C. § 1367(d).

## IV.    Conclusion

For the reasons set forth above, the Court finds that Defendant TSA is immune from suit under the FTCA because the "discretionary function" exception to the Act applies.  The Court further declines to exercise supplemental jurisdiction over Defendant Port Authority, and tolls Plaintiffs state law claims against Port Authority for thirty days.

An appropriate Order shall follow.


                                     /s/ Freda L. Wolfson
                                    Honorable Freda L. Wolfson
                                    United States District Judge


Dated: February 26, 2010

24